JUSTICE NELSON
dissents and concurs.
*290 I. Introduction
¶48 I concur in portions of the majority opinion, as noted below. However, I dissent from the ultimate decision of the Court. Constitutional issues aside, this case can, and should, be decided by applying the three plain and unambiguous statutes that pertain to this case-§ 87-2-109, MCA, § 87-1-502(6), MCA, and § 87-l-506(l)(b), MCA. The majority has given effect to the former two statutes, but has completely ignored the latter statute in order to reach a result that grants game wardens[1] broad authority to inspect catches in the field and purportedly protect wild fish and game as an environmental resource. While this resolution may be politically palatable, it is legally incorrect. The search at issue-and there was one, the trial court’s and this Court’s conclusions to the contrary notwithstanding-was unlawful under § 87-l-506(l)(b), MCA, and should have been suppressed.
¶49 I will first set out those portions of the Court’s opinion in which I concur and then turn to my disagreement with our decision. Finally, since the majority opinion raises several constitutional issues, I will, of necessity, also address those.
II. Discussion

A. Concurrence:

¶50 I agree with the result of the Court’s decision as articulated under ‘A. Jones’ Initial Advance on Boyer’s Boat.’ Clearly, on the facts here, Jones initially approached Boyer’s boat, not because he believed that the presumed occupant had committed, was committing or was about to commit a criminal offense (see § 46-5-401, MCA), but, rather, to inquire into the safety and welfare of the presumed occupant (who turned out to be Boyer). As noted, we have held that peace officers are privileged to make these sorts of noncriminal, investigatory ‘welfare checks.’ See Grinde v. State (1991), 249 Mont. 77, 81, 813 P.2d 473, 476, overruled on other grounds by Bush v. Montana DOJ, 1998 MT 270, 291 Mont. 359, 968 P.2d 716.
¶51 I also agree that once Jones’s ‘welfare check’ was completed, he had the right, without need of any predicate particularized suspicion, to request to see Boyer’s fishing license and catch. As stated by the majority, § 87-2-109, MCA, requires a fisher to carry his license and to *291 exhibit it on request of a game warden. Moreover, § 87-1-502(6), MCA, provides, in pertinent part:
A warden has the authority to inspect any and all fish ... at reasonable times and at any location other than a residence or dwelling. Upon request therefore, all persons having in their possession any fish... shall exhibit the same and all thereof to the warden for inspection.
Under this statute, Boyer was obligated to produce his catch on Jones’s request and Boyer could have been charged with a misdemeanor if he refused. See Title 87, Chapter 1, Part 1, generally and, in particular, § 87-1-102, MCA, and § 87-1-506(1)©, MCA.
¶52 Turning to the record before us, it is clear that Boyer was cooperative with Jones. Boyer freely admitted he had been fishing; he produced his fishing license when requested to do so; and he stated that he had fish in his possession which were in the closed live well in his boat. When asked to produce the fish, Boyer equivocated, but finally opened the live well and removed a legal number of fish.
¶53 Again, the record demonstrates that, from his position in his boat, Jones could not see into Boyer’s live well. At this stage of the scenario, because of Boyer’s hesitancy, Jones suspected that Boyer had too many fish in his possession. Notwithstanding, Jones conceded that he had no probable cause to believe that Boyer was in violation of the law limiting his possession of certain species of fish. And, this concession is important because it establishes that, on the record here, Jones had no legal authority to tie onto or to board Boyer’s boat and to then engage in what was a warrantless search of the boat and the live well located within it. It is here, and for this reason, that I part company with the Court.

B. Dissent:

1. Boyer’s Reasonable Expectation of Privacy in His Boat and in the Live Well
¶54 In that part of the Court’s opinion captioned ‘2. The Request to Produce Boyer’s Catch,’ the majority states at ¶ 18 that ‘[t]he precise inquiry, then, is whether Boyer is entitled to a reasonable expectation of privacy in the game fish he possessed.’[2] The Court then launches into an extended discussion of constitutional privacy, the constitutional *292 obligation to maintain a clean and healthful environment and constitutional principles of search and seizure law-all to the end that ‘our wild places and the creatures that inhabit them are preserved for future generations.’ Far be it from me to denigrate the importance of any of these general legal principles and these environmental and social imperatives. Indeed, I support them wholeheartedly.
¶55 The problem here, however, is that the ‘precise inquiry’ is not whether Boyer had a reasonable expectation of privacy in his fish, but, rather, whether he had a reasonable expectation of privacy in his boat and in his live well. While I agree that Jones could request to see Boyer’s license and catch without predicate particularized suspicion, there is a critical distinction between inspecting the catch and inspecting a container that holds the catch-which is, itself, within the confines of the boat. Indeed, the majority’s seemingly innocuous restatement of the issue from that actually decided by the trial court enables it to then ignore the record and reach the result sought. Importantly, when the ‘precise inquiry’ is, properly framed-i.e. whether Boyer had a privacy interest in his boat and his live well-the majority’s analysis falls apart. To that part of the Court’s opinion I now turn.
¶56 While directly on point, the Court dismisses our decision in State v. Elison, 2000 MT 323, 302 Mont. 228, 14 P.3d 456, on the basis that Boyer had no expectation of privacy in his catch. See ¶ 39. However, as noted, the majority’s focus on the fish is too narrow. The real focus of Elison is on the boat.
¶57 Elison explains at some length that Montana’s Constitution, Article II, Sections 10 and 11, confers greater privacy protection than does federal law from warrantless searches of automobiles. Elison, in fact, rejects federal jurisprudence that allows such searches under the Fourth Amendment to the United States Constitution. Elison, ¶¶ 39-51. Elison states that this Court has reaffirmed that ‘the word ‘automobile’ is not a talisman in whose presence the ... [warrant requirement] fades away and disappears.’ Elison, ¶ 47 (citing State v. Sawyer (1977), 174 Mont. 512, 517, 571 P.2d 1131, 1133). Because an individual has a reasonable privacy interest in areas where items can be stowed out of sight in his automobile; because warrantless searches of automobiles invades this legitimate interest; and even assuming compelling state interests may be implicated, ‘the State may not invade an individual’s privacy unless the procedural safeguards attached to the right to be free from unreasonable searches and seizures are met.’ Elison, ¶ 53 (citing Hulse v. Department of Justice, *293 1998 MT 108, ¶ 34, 289 Mont. 1, ¶ 34, 961 P.2d 75, ¶ 34). In making this point, we stated unequivocally:
Because of the legitimate privacy interests implicated and the invasive and generally overbroad nature of the state’s intrusion on these interests, the search of an automobile requires more than merely the existence of probable cause to believe it contains evidence of a crime. On the foregoing basis, we conclude that, despite any language to the contrary in our previous decisions, there is no ‘automobile exception’ to the search warrant requirement under the Montana Constitution. Rather, as we have consistently held, a warrantless search of an automobile requires the existence of probable cause as well as a generally applicable exception to the warrant requirement such as a plain view search, a search incident to arrest, or exigent circumstances.
Elison, ¶ 54 (emphasis added).
¶58 This statement of law, of course, begs the question: ‘Is a boat the equivalent of an automobile for purposes of search and seizure?’ Montana has not addressed this question directly, but the case law from other jurisdictions provides an affirmative answer. For purposes of search and seizure, boats on public waterways and automobiles on public highways are not subject to different legal principles. See Carroll v. United States (1925), 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (distinguishing between stationary structures and movable vehicles for Fourth Amendment warrant purposes); United States v. Lauchli (7th Cir. 1984), 724 F.2d 1279, 1282 (officer had probable cause and exigent circumstances to search boat without a warrant); United States v. Whitaker (5th Cir. 1979), 592 F.2d 826, 829-30 (automobile exception applies to boats; areas of a boat might have heightened expectations of privacy); United States v. Weinrich (5th Cir. 1978), 586 F.2d 481, 494; Blair v. United States (4th Cir. 1981), 665 F.2d 500, 505 (Fourth Amendment analysis applies to searches of boats); Prochaska v. Marcoux (10th Cir. 1980), 632 F.2d 848, 852 (no Fourth Amendment violation because officer did not board the boat); United States v. Raub (9th Cir. 1980), 637 F.2d 1205, 1208 (warrantless boarding of boat falls within Fourth Amendment); State v. Sullivan (Mo. Ct. App. 1996), 935 S.W.2d 747; Taylor v. State (Fla. Dist. Ct. App. 1978), 355 So.2d 180 (authority to stop boat does not include authority to conduct general search of the boat).
¶59 Thus, boats on public waterways and automobiles on public highways, being equivalent moveable objects or ‘vehicles’ for purposes of applying search and seizure jurisprudence, it follows that under *294 Elison, individuals boating on Montana’s public waterways have a reasonable expectation of privacy in their boats and in items stowed therein beyond the purview of the public. This privacy interest is subject to greater protection than that afforded under federal law. And, even a ssuming a compelling state interest (such as apprehending fishers who catch too many fish), ‘the State may not invade [this privacy interest] unless the procedural safeguards attached to the right to be free from unreasonable searches and seizures are met.’ Boats have no more ‘talismanic’ significance when it comes to the guarantees against unreasonable searches and seizures under Article II, Sections 10 and 11 (and under the Fourth Amendment) than do automobiles. Elison requires that to search a boat, the peace officer must have a warrant or if the search is warrantless, then he must have probable cause coupled with a generally applicable exception to the warrant requirement. Elison, ¶¶ 47,53,54. While the majority asserts that the search in Elison was more invasive, in fact, the searches are fundamentally similar. In both cases the law enforcement officer invaded the reasonable and legitimate privacy interest of the defendant in his vehicle/boat for the purpose of searching for and seizing evidence of criminal conduct, and the officer did so without a warrant and without demonstrating a generally applicable exception to the warrant requirement.
¶60 Of necessity, that brings us to the part of the majority opinion captioned ‘C. Stepping on Boyer’s Boat.’
¶61 A forthright appraisal of the record in this case clearly demonstrates that the only reason Jones tied onto Boyer’s boat was so that he could board the boat and look into the live well that he could not see into from his own boat and which he suspected contained more fish than those displayed by Boyer. The State’s brief candidly asserts that ‘[bjecause Boyer [sic] was unable to see into the live well from his boat, he [Jones] tied onto Boyer’s boat and stepped onto the exterior platform attached to the transom of Boyer’s boat.’
¶62 Moreover, the transcript of Jones’s answers to questions at the District Court suppression hearing dictates this conclusion:
Q. Then what did he do after the eighth fish?
A. He laid the eighth fish out, and then I wasn’t able to see or-the balance or whatever was still in the live well, so I drifted back, tied my boat off to his-to his, and stepped out on his-it’s actually a platform off the rear of his boat.
Q. Yes, and then did you look in the live well yourself?
A. Yes.
*295 Q. And you stepped onto his boat for what purpose again?
A. To count the remainder of the fish and take a look at the remainder of the fish he had in his live well.
Q. Could you see the fish from your position in the boat before you moved?
A. No.
Q. Why couldn’t you see it:
A. Well I just wasn’t up at a point-you know, in order to see you have to pretty much be above the live well.
Q. When you stepped onto this platform on the back of his boat, your purpose was to look into the live well and to examine the fish he had remaining; is that right?
A. Right.
Q. If you hadn’t seen the remaining fish in the live well, and all you saw was the eight laying on the deck, did you have-do you think you had probable cause at that point to search the live well?
A. Well I’m trying to remember whether or not he indicated that there were, you know, definitely more fish in there, and I don’t remember the conversation whether he did or he didn’t. So you’re asking if I had known there was additional fish in there?
A. Well I don’t think I did when he laid out the eight and said, can we do this later, and, you know, once we conversed about it and talked, you know he agreed to, you know, let me look in the live well[3].
Q. [The defense attorney] asked you several questions several times about particularized suspicion and probable cause, and at several instances through out this encounter with the defendant, and based upon your testimony, what you’re telling the court is you didn’t have any probable cause to stop and search his boat until you actually saw he had excess fish; it that right?
A. That’s correct.
¶63 Again, it is important to recognize that, at the point of his tying onto Boyer’s boat, Jones conceded that he had no probable cause to believe that Boyer had done anything unlawful. The record *296 unequivocally demonstrates that Jones boarded Boyer’s boat-i.e., that he invaded a space in which Boyer had a constitutionally protected privacy interest — without a warrant; without probable cause; and for the sole purposes of inspecting a container within the boat (that he otherwise could not see into without boarding the boat) to gather evidence of what he suspected was a criminal act.
¶64 The Court justifies this warrantless invasion in three ways. First the majority categorize Jones’s seizure as an ‘investigatory stop.’ Second, the Court likens the platform on the transom of Boyer’s boat to a porch abutting a house. And, third, the majority concludes that, once legally on the transom platform, Jones could see into the open live well with the result that the illegal fish were in ‘plain view.’ If ever there was an example of hoisting oneself to the top of a house of cards by one’s own bootstraps, this part of the majority opinion fits the bill precisely. In disposing of this analysis, I will address the ‘plain view’ contention first.
¶65 It is clear that if Jones was not legally on Boyer’s boat in the first place-and he was not-then the plain view doctrine cannot justify the officer’s observation and seizure of evidence of criminal conduct that was located in a container within the boat and into which Jones could not see except by boarding the boat. In State v. Loh (1996), 275 Mont. 460, 914 P.2d 592, we made clear this point of law:
The essential predicate to any valid warrantless seizure of incriminating evidence [under the plain view doctrine] is that the officer must be lawfully at the place from which he could plainly view the evidence. In other words, his initial entry onto or intrusion into the place where he views the evidence must not have been in violation of the Fourth Amendment or in violation of Article II, Section 11 of Montana’s Constitution.
Loh, 275 Mont. at 473, 914 P.2d at 600. Further, unlike the majority’s analogy to an officer stepping onto a running board or bumper of a pickup to get a better look at a kill in back or otherwise in plain view, Jones, according to his testimony, did not know there were any fish in the five well until he looked. In the case at bar, there were no illegal fish in ‘plain view’ until Jones boarded the boat and thereby invaded Boyer’s constitutional zone of privacy.
¶66 Next, turning to the majority’s ‘investigatory stop’ and ‘platform-on-the-transom-is-a-porch analysis,’ this entire discussion is nothing more than a red-herring (or, perhaps, more accurately, a red-walleye) designed to provide a convenient, albeit legally disingenuous, vehicle to get Jones from his boat (where he could not see into the live well) *297 onto Boyer’s craft where he could then observe the incriminating evidence in ‘plain view.’ This mental legerdemain is akin to the majority placing the ‘privacy focus on the fish, rather than on Boyer’s boat, where, as already noted, it properly belongs. This ruse cannot be sustained on the record before us, however.
¶67 As has been already aptly demonstrated, Jones boarded Boyer’s boat for one and only one purpose-to look into the five well so as to confirm his belief that Boyer was in possession of more fish than he was allowed under the law. This activity constituted a constitutional search in the purest sense.
¶68 It is well established that the Fourth Amendment protects people, not places, and that what a person seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. Katz v. United States (1967), 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582; State v. Bullock (1995), 272 Mont. 361, 375, 901 P.2d 61, 70. Accordingly, when the police invade an area in which a person has an actual expectation of privacy that society is willing to recognize as reasonable, then, in the constitutional sense, a ‘search’ has occurred. See Bullock, 272 Mont. at 384, 901 P.2d at 75-76; Elison, ¶ 48.
¶69 Fundamentally, a ‘search,’ in the constitutional sense, is simply a quest by an officer of the law with an intention to find, which invades a constitutionally protected area. State v. Williams (1969), 153 Mont. 262, 269, 455 P.2d 634, 638. It is ‘some means of gathering evidence which infringes upon a person’s reasonable expectation of privacy.’ Elison, ¶ 48 (citing Hulse, ¶ 22).
¶70 Moreover, as already noted, because of Montana’s unique protection of the right of individual privacy afforded by Article II, Section 10, this Court has consistently held that Montanans enjoy broader protection in search and seizure cases under Article II, Section 11, than is provided under the Fourth Amendment. Bullock, 272 Mont. at 384, 901 P.2d at 75; State v. Siegal (1997), 281 Mont. 250, 263, 934 P.2d 176, 183; Elison, ¶¶ 45-47.
¶71 On the record here, Jones did not tie onto and board Boyer’s boat to ‘investigate.’ Rather he agreed, unequivocally, that he boarded the boat to: ‘look into the live well and to examine the fish [Boyer] had remaining.’ And, he conceded that he did so without probable cause to conduct this search.
¶72 As to the ‘platform-on-the-transom-is-a-porch’ part of the majority opinion, the Court cites no authority (and I have found none) for the proposition that a platform on the transom of a boat is anything but what common sense dictates it actually is-part of the boat. The *298 analogy to the platform on the transom being a porch does not comport even remotely with commonly accepted definitions of these words.
¶73 Specifically, MERRIAM WEBSTER’S COLLEGIATE DICTIONARY 1255 (10th ed. 1997) (hereinafter WEBSTER), defines a ‘transom’ (as it relates to a boat) as ‘any of several transverse timbers or beams secured to the stempost of a boat.’ A ‘platform,’ as pertains here, is defined as a ‘raised horizontal flat surface.’ Webster, at 891. And a ‘porch’ is defined as a ‘covered area adjoining an entrance to a building and usu. having a separate roof.’ WEBSTER, at 906.
¶74 Was the platform on the transom of Boyer’s boat a ‘covered area adjoining an entrance to a building ... [with] ... a separate roof?’ Not according to the record here.
¶75 Furthermore, the platform on the transom of a boat is no more ‘public’ or less entitled to constitutional protection than any other part of the boat. The majority opinion begs the question: if the boat had not had a platform on the transom, could the game warden have stepped on the out-drive in order to climb onto the boat since that was sticking out from the stern of the boat and was ‘readily accessible to the public?’ If there were no platform on the transom, could Jones have simply climbed over the stern or over the side of Boyer’s boat, and would that have turned what the majority concludes is a legal search into an illegal one? What if the top of the stem was low to the water versus high to the water? Would the game warden be legally entitled to climb over the former, but not the latter? What if there was a ladder attached to the stern of the boat? Would a ladder also be classified as a ‘porch’ for search and seizure purposes? The absurdity of the majority’s analogy is apparent.
¶76 In short, the Court’s ‘platform-on-the-transom-is-a-porch’ analogy is, as Abraham Lincoln is reported to have observed, ‘as thin as the homeopathic soup that was made by boiling the shadow of a pigeon that had been starved to death.’ See Beamsley v. Commissioner of Internal Revenue (7th Cir. 1953), 205 F.2d 743, 748. Indeed, it will no doubt come as a shock to Montana boat owners to learn that a device which makes boarding the boat more convenient for those legally entitled or invited, has now been transformed by this Court into a public access. Boat owners might now be well-advised to post ‘no trespassing’ signs on their vessels to protect their privacy interests.
¶77 In summary, as a matter of law, Boyer had the same privacy interest in his boat and in that which was stowed in a place where it could not be seen from outside the boat, as he would have had in his automobile and in items stowed away from the purview of the public *299 in his automobile. Elison dictates this conclusion.
¶78 Here we have Jones, a peace officer, entering onto Boyer’s boat-in which Boyer had a reasonable privacy interest-specifically to look for evidence of suspected criminal conduct that could not be observed without boarding the boat. Viewed in this light-which is the only context that the record actually supports-we are confronted with a classic search in the constitutional sense. And, that brings us to § 87-1-506(l)(b), MCA.
2. Section 87-l-506(l)(b), MCA, Applies to Jones’s Search of Boyer’s Boat.
¶79 Presumably seeking to balance fishers’ Article II, Sections 10 and 11 guarantees against unreasonable searches and seizures and its desire ‘[t]o safeguard Montana’s wildlife for present and future generations,’ the Legislature enacted § 87-l-506(l)(b), MCA. The majority pays no attention to this statute. Indeed, the majority, inexplicably, concludes that this statute does not apply to the facts in this cause at any stage, including when Jones stepped onto Boyer’s boat. See ¶¶ 17, 18, 26.
¶80 Rather, the majority hangs its hat on its constitutional, ‘investigatory stop,’ and‘platform-on-the-transom-is-a-porch’ analyses. Understandably the majority takes this approach, because if it applied § 87-l-506(l)(b), MCA, it would have to conclude, as I do, that Jones’s search violated the statute and was, therefore, unlawful. Unfortunately, in ignoring § 87-l-506(l)(b)-the statute directly applicable to the case at bar-the Court errs.
¶81 Section 87-l-506(l)(b), MCA, provides that a warden may:
search, without a warrant, any tent not used as a residence, any boat, vehicle, box, locker, basket, creel, crate, game bag, or package, or their contents upon probable cause to believe that any fish and game law or department rule for the protection, conservation, or propagation of game, fish, birds, or fur-bearing animals has been violated, (emphasis added)
Under this statute, any ‘search’ of the property listed must be based upon probable cause.
¶82 Did Jones have probable cause when he boarded Boyer’s boat to conduct his search for the suspected over-limit fish? On the record, Jones conceded that he did not. Rather, according to the record Jones stated that he had ‘some suspicion.’
¶83 Assuming, arguendo, that ‘some suspicion’ rises to the level of ‘particularized suspicion’-and it does not even under the majority’s authority cited at ¶ 29 of the opinion-it is legally uncontrovertible that *300 ‘particularized suspicion,’ (or the analogous terms ‘reasonable suspicion’ and ‘reasonable grounds’) is not the equivalent of ‘probable cause.’ Particularized suspicion represents a quantum of bebef, understanding or knowledge weaker than probable cause. See Deserly v. Department of Corrections, 2000 MT 42, ¶¶ 25, 30, 298 Mont. 328, ¶¶ 25, 30, 995 P.2d 972, ¶¶ 25, 30.
¶84 Accordingly, under the plain and unambiguous language of § 87-1-506(l)(b), MCA, Jones’s search was unlawful. Jones had no probable cause to board Boyer’s boat or to search the live well.[4] We need go no further in order to hold that the trial court’s failure to suppress was error as a matter of law. Jones’s search violated § 87-2-506(l)(b), MCA, and I would reverse on this basis without more.
3. Constitutional Issues
¶85 That said, there are two other facets of the majority opinion that must be addressed. These two issues are integrally bound up in the majority’s analysis, in its re-framing of the ‘precise issue’ to focus on Boyer’s catch, and in its failure to address and apply § 87-l-506(l)(b), MCA.
¶86 First, by failing to apply § 87-2-506(l)(b), MCA, the Court conveniently avoids the need to address Elison’s requirement that a warrantless search of a vehicle be justified by probable cause coupled with a generally applicable exception to the warrant requirement. Obviously, § 87-2-506(l)(b), MCA, includes only half the requirements for a constitutionally valid warrantless search-the probable cause half. Section 87-2-506(l)(b), MCA, contains no requirement for the warrantless search to be also supported by a generally applicable exception to the warrant requirement-the second half of the Elison mandate.
¶87 Arguably, this is not a problem in the case at bar, because, as discussed above, the record is clear that Jones did not even have probable cause to search Boyer’s boat. Whether Jones could or could not demonstrate a generally applicable exception to the warrant requirement is, thus, largely irrelevant. Without more, we could, and *301 should, simply apply § 87-l-506(l)(b), MCA, and hold that Jones’s search was invalid.
¶88 That said, I will concede, however, that the majority’s approach of simply ignoring § 87-l-506(l)(b), MCA, avoids the more serious issue-i.e., whether the Legislature can, under Montana’s Constitution, statutorily authorize a warrantless search based merely on probable cause. As to that, I conclude it is beyond the power of the Legislature to do so. Indeed, in my view, § 87-l-506(l)(b), MCA, is facially unconstitutional.
¶89 In enacting this statute the Legislature has: (a) eliminated the Constitution’s warrant requirement and (b) also disposed of the requirement that warrantless searches be supported by both probable cause and a judicially-recognized exception to the warrant requirement. I vehemently disagree that a law can be enacted to accomplish this result.
¶90 In interpreting both the United States Constitution and Montana’s Constitution, we have frequently reaffirmed a time-worn dogma that is gospel to every first-year law student: warrantless searches and seizures are per se unreasonable subject to only a few carefully drawn exceptions. Katz, 389 U.S. at 357, 88 S.Ct. at 514, 19 L.Ed.2d at 585; Loh, 275 Mont. at 468, 914 P.2d at 57; Elison, ¶ 39.
¶91 These exceptions are, fortunately, few and have been developed over decades by the courts. In Montana (and concomitantly under federal jurisprudence, although the federal counter-part cases are not cited) these exceptions include: a search incident to a lawful arrest, State v. Graham (1995), 271 Mont. 510, 512, 898 P.2d 1206, 1208; evidence in plain view, (though listed as an ‘exception’ there really is no constitutional search or seizure where the doctrine applies), Loh, 275 Mont. at 468, 914 P.2d at 597; evidence discovered from a protective frisk during a stop based on reasonable suspicion, State v. Dawson (1999), 295 Mont. 212, 219, 983 P.2d 916, 921; evidence discovered during hot pursuit, State v. Dow (1992), 256 Mont. 126, 132, 844 P.2d 780, 784; and exigent circumstances that show evidence will disappear if not seized without a warrant, State v. Wakeford, 1998 MT 16, ¶ 24-32, 287 Mont. 220, ¶ 24-32, 953 P.2d 1065, ¶ 24-32. Federal jurisprudence also allows for an ‘automobile exception’-see Carroll, 267 U.S. at 153, 45 S.Ct. at 285, 69 L.Ed. 543 and its progeny-but, as already noted, Montana has done away with this exception to the warrant requirement by reason of the greater protections afforded under Article II, Sections 10 and 11.
¶92 Each of these ‘carefully drawn’ exceptions typically involves *302 circumstances where the accused’s privacy rights are not unreasonably infringed by the search and, more importantly, each exception is, at its heart, grounded in the exigent circumstances inherent in the particular situation.
¶93 In the case at bar, where fish and game are involved, the Legislature has, by statute, selectively authorized a class of searches that, at one and the same time, violates the Constitution and creates a class of peace officers that do not have to follow the search and seizure strictures that bind other law enforcement officers. The plain language of § 87-l-506(l)(b), MCA, summarily does away with the warrant requirement of the Fourth Amendment and Article II, Section 11, and, additionally, authorizes these warrantless searches to be based merely on probable cause and without a generally applicable exception to the warrant requirement of the Constitution.
¶94 If the Legislature can do this in fish and game cases, then, it follows I suppose, that all sorts of other exceptions to the warrant requirement can be created simply by legislative fiat. Why not statutorily authorize automobile searches based merely on probable cause? Elison should not stand in the way if the Legislature chooses to delete the ‘generally applicable exception’ requirement which this Court imposed for warrantless searches in such cases. Why not statutorily authorize seizure of a person’s medical records based simply on probable cause? Who needs a warrant if the Legislature decides otherwise? I cannot agree that the Legislature has this power.
¶95 It is a fundamental — and, perhaps the most fundamental — principle of constitutional law that a legislative body cannot abrogate constitutional rights by the simple expedient of enacting a law or statute. Marbury v. Madison (1803), 5 U.S. 137, 176-78, 2 L.Ed. 60 (the United States Constitution is ‘the basis on which the whole American fabric has been erected’ and is ‘superior to any ordinary act of the [L]egislature’); State ex rel. Bennett v. Bonner (1950), 123 Mont. 414, 435, 214 P.2d 747, 758 (“Whenever the will of the [Legislature, declared in its statutes, stands in opposition to the will of the people, declared in the [Constitution, the judges ought to be governed by the [Constitution rather than by the statutes’); Hurtado v. California (1884), 110 U.S. 516, 535, 4 S.Ct. 111, 120, 28 L.Ed. 232 (‘Due process of law ... refers to that law of the land which derives its authority from the legislative powers conferred upon [Cjongress by the [Constitution of the United States, exercised within the limits therein prescribed, and interpreted according to the principles of the common law.’); Northwestern Mut. Life Ins. Co. v. Lewis & Clarke County (1903), 28 *303 Mont. 484, 496-97, 72 P. 982, 984-6 (Constitution is the fundamental law).
¶96 As noted above, warrantless searches axe per se unreasonable and, to be otherwise justified, must be based on probable cause and a carefully drawn exception. Katz, 389 U.S. at 357, 88 S.Ct. at 514, 19 L.Ed.2d at 585; Elison, ¶ 54. One without the other is patently unconstitutional. And, § 87-l-506(l)(b), MCA, which authorizes warrantless searches based merely on probable cause is precisely that-unconstitutional on its face.
¶97 That is not to say that the Legislature might not craft a statute that is in accord with the requirements of Article II, Sections 10 and 11, as this Court has interpreted those.[5] Indeed, I recognize that exigent circumstances, an established and carefully-drawn exception to the warrant requirement, may be present when a game warden is in the field. However, exigent circumstances are not textually required by § 87-l-506(l)(b), MCA. Rather, the statute simply disposes, wholesale, of (a) the warrant requirement and (b) the ‘generally applicable exception’ prong of the two-prong requirement for warrantless searches when it comes to the vast majority of fish and game search cases. And that is a fatal and facial flaw in the statute. See Berger v. New York (1967), 388 U.S. 41, 58-60, 87 S.Ct. 1873, 1883-84, 18 L.Ed.2d 1040 (striking down state statute that was too broad in its sweep and therefore violated Fourth Amendment protections).
¶98 In Elison, we departed from federal law and held that Montana has no general ‘automobile exception’ to the warrant requirement because our state constitution affords greater privacy rights than the federal constitution. Elison, ¶ 46-51. We held that specific exigent circumstances must be shown because exigency is not automatically inherent in the fact that evidence is in a vehicle. The standard in fish and game search cases should be no less. Indeed, it cannot be. To paraphrase, ‘the word ‘boat’ is not a talisman in whose presence the ... [warrant requirement] fades away and disappears.’ Elison, ¶ 47.
¶99 Finally, I must address the majority’s reliance on Article IX, Section 1(1), the clean and healthful environment provision of Montana’s Constitution. Again, I have no problem with the premise *304 argued vigorously by the State, and adopted by the majority, that this provision of Montana’s Constitution protects Montana’s wildlife for present and future generations. Indeed, I can only hope that the State remembers well this argument and just as vigorously enforces this constitutional imperative the next time some individual or business poisons Montana’s ground, water and air with toxic wastes and pollutants and when laws and administrative rules are enacted which weaken the protections afforded by this part of our Constitution and which allow degradation of its precious natural resources.
¶100 Nor do I reject the notion that the Constitutional guarantee of a clean and healthful environment may be implicated in search and seizure cases. In fact, in Armstrong v. State, 1999 MT 261, 296 Mont. 361, 989 P.2d 364, we observed that Montana’s Constitution was drafted as a compact of overlapping and redundant rights and guarantees. Armstrong, ¶ 71.
¶101 Nonetheless, no constitutional guarantee is absolute. See Bozeman Daily Chronicle v. City of Bozeman Police Dept. (1993), 260 Mont. 218, 224, 859 P.2d 435, 439 (balancing constitutional right of public to know with individual’s constitutional right to privacy). Competing constitutional rights must sometimes, of necessity, be balanced one against the other. At least under the facts presented in the case at bar, where the fundamental rights of individual privacy and freedom from unreasonable searches and seizures must be balanced against the right to a clean and healthful environment, I would hold that the latter may not trump the former. Individual privacy is simply too precious and fragile a constitutional right to be sacrificed on the altar of cases such as the one at issue here.
¶102 In reaching this conclusion, however, I reiterate the view expressed in my concurrence in Associated Press Inc. v. Montana Dept. of Revenue, 2000 MT 160, 300 Mont. 233, 4 P.3d 5, that the right of privacy protected under Article II, Section 10 is guaranteed to individuals-i.e. human beings-only and is not a right enjoyed by nonhuman entities. Associated Press, ¶¶ 45-131 (J. Nelson, concurring). Indeed, since business organizations do not enjoy the full plethora of Fourth Amendment rights-see, G.M. Leasing Corp. v. United States (1977), 429 U.S. 338, 353, 97 S.Ct. 619, 629, 50 L.Ed. 2d 530 (a business by its special nature and voluntary existence may open itself to intrusions that would not be permissible in a purely private context)-in the balancing calculus, constitutional environmental guarantees may carry the greater weight and may, thus, allow searches and seizures of the property and effects of non-human entities *305 that might not pass muster if individuals were involved.
Conclusion
¶103 Based on the plain language of § 87-l-506(l)(b), MCA, I would hold that Jones’s search of Boyer’s boat was unlawful since the search was not based upon probable cause. Accordingly, I would reverse the District Court’s denial of Boyer’s motion to suppress. I disagree with our decision not to reach that result.
¶104 Except to the extent to which I concur as indicated above, I dissent.

 It is uncontroverted that Game Warden Jones is a ‘peace officer’ authorized to investigate Title 87, MCA, offenses and to search, seize and arrest in conjunction therewith. Sections 87-l-502(7)(a) & (b), MCA, and § 87-1-506, MCA. See also §§ 1-1-207(2) and 46-1-202(17), MCA.

 The majority similarly frame the issue in this fashion at ¶ 39. Even the trial court did not see the privacy issue as involving the fish. Rather the District Court held there was no search because Boyer had no privacy interest in his boat on a public waterway. See ¶ 6.

 The District Court concluded, and neither party disagrees, that Boyer did not consent to a search of his boat or the live well.

 Because the majority did not analyze § 87-l-506(l)(b), MCA, in detail, there is no discussion regarding whether a live well falls within the list of possible containers that can be searched under § 87-l-506(l)(b), MCA. While the list does not specify live wells, per se, such a container serves a similar function as a locker or, perhaps, a creel or a game bag. More importantly, the live well here, as I understand it, was physically part of the boat-and boats are referred to in the statute. Moreover, neither party has argued that a live well should be excluded from the statute since it is not specifically listed. Accordingly, for purposes of this opinion, at least, I assume that a live well is within the protection of the statutory requirements.

 For example, see § 46-6-311, MCA, which reads: ‘(1) A peace officer may arrest a person when a warrant has not been issued if the officer has probable cause to believe that the person is committing an offense or that the person has committed an offense and existing circumstances require immediate arrest.
(2) (a) The summoning of a peace officer to a place of residence by a partner or family member constitutes an exigent circumstance for making an arrest.’